IN RE: L.H., L.H.
No. COA07-496
Court of Appeals of North Carolina.
Filed August 21, 2007
This case not for publication
Peter Wood, for respondent-appellant.
Albert J. Singer, for petitioner-appellee.
Kennedy Covington Lobdell & Hickman, L.L.P., by Ceclia E. Rutherford, for appellee Guardian ad Litem.
ELMORE, Judge.
Respondent-mother I.B. appeals from the district court's order terminating her parental rights to her twin minor children, La.H. and Le.H. The order also terminated the parental rights of the children's father, L.H., Jr., who is not a party to this appeal.
La.H. and Le.H. were born prematurely in October, 2005. On 20 February 2006, the Wake County Human Services (WCHS) obtained non-secure custody of the children and placed them together in a foster home after filing petitions alleging that they were neglected and dependent juveniles. In the petitions, WCHS claimed that it had been unable to locate the children for several weeks, and that the children were in need of medical care due to their premature births and low birth weights. The petitions claimed that both parents had unresolved substance abuse problems and were living "from pillar to post" in various homes in Wake and Granville Counties. WCHS further alleged that respondent-father had asked WCHS for assistance in caring for the children, and that respondent-mother's whereabouts were unknown.
The children were examined at Duke Children's Primary Care on 22 February 2006. Both children were underweight and suffering from severe diaper rash. La.H. was found to have an umbilical hernia which required monitoring. Le.H. was treated with antibiotics for a "serious infection . . . mostly likely due to poor hygiene."
The court appointed counsel to represent respondent-mother at the seven-day hearing held 22 February 2006, and entered an order continuing the children in the non-secure custody of WCHS on 6 March 2006.
Following a hearing held 22 March 2006, the district court adjudicated the minor children to be neglected and dependent, in the WCHS petition. The court found that the twins were premature, low birth-weight infants and had been denied necessary medical care by their parents. The court found that respondent-mother's whereabouts had been determined after she was arrested and jailed for shoplifting in Wake County. Although respondent-mother had been released from jail on 10 March 2006, the WCHS social worker had been unable to contact her or respondent-father "despite her diligent efforts to do so." The court found that respondent-mother lacked a stable residence and had a history of incarcerations and chronic cocaine, heroin, and marijuana abuse. The court further found that respondent-mother had seven other children, none of whom lived with her, and that her parental rights to at least three of the children had been terminated. Noting that La.H. and Le.H. were in need of additional medical care due to their premature births, the court ceased reunification efforts with respondent-mother, finding that such efforts would be "futile and inconsistent with [the children's] health, safety and need for a safe, permanent home." It ordered respondent-mother to contact the WCHS social worker, enter into a case plan, and comply with its conditions if she wished to pursue reunification with her infant twins. The court established a placement plan of reunification with the father, with a concurrent plan of adoption.
The district court held a permanency planning hearing on 19 April 2006. Respondent-mother was served with notice of the hearing but did not attend. In an order entered 1 May 2006, the court adopted a permanent placement plan of reunification with the father, and a concurrent plan of adoption. The court found that respondent-mother met with WCHS, submitted a negative drug screen, and developed a case plan on 4 April 2006. Although she had scheduled an appointment for substance abuse treatment, she had not contacted her social worker since 6 April 2006. To the extent she desired reunification with the children, respondent-mother was ordered to do the following: (1) obtain a psychological evaluation and follow its recommendations; (2) initiate and maintain regular contact with WCHS; (3) successfully complete substance abuse treatment, submit to random drug screens, and abstain from drug use; (4) obtain stable employment and safe, stable housing suitable for the children; (5) pay child support; and (6) attend biweekly supervised visitations.
In a review order entered 29 May 2006, the court found that respondent-mother had attended her second visitation with the children on 19 April 2006. The court noted that respondent-mother had spent three weeks in jail after violating her probation.
On 10 August 2006, the court ceased reunification efforts with respondent-father and changed the children's permanent placement plan to adoption. The order included findings that neither parent had visited the children since 19 April 2006, and that respondent-mother had "been incarcerated since the last hearing, and [was] in Wake County Jail on new charges of larceny and simple assault."
WCHS filed a motion to terminate respondents' parental rights on 31 October 2006. As grounds for termination of respondent-mother's rights, the motion asserted: (1) each parent had neglected the children, and there was a probability of future neglect if the children were returned to their care; (2) the children were dependent because each parent lacked the capacity to provide proper care and was likely to remain incapable of providing proper care for the foreseeable future; and (3) respondent-mother's parental rights to other children had been terminated involuntarily and she was unable or unwilling to establish a safe home for La.H. and Le.H. The court held a hearing on WCHS's motion on 23 January 2007. WCHS social worker LeAnn Watson recounted the circumstances that led to the twins' adjudication as neglected and dependent juveniles, as well as the parents' subsequent non-compliance with their respective case plans. Respondent-mother testified and called as a witness Morocco Abdul-Haqq, who had been working with her since 27 December 2006 through a community support organization called United Youth Care. Based on the evidence at adjudication, the court found grounds to terminate respondent-mother's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1) and (9). At disposition, the court reviewed the Guardian ad Litem's report and received additional testimony from the WCHS social worker and respondent-mother. Upon further findings consistent with the Guardian ad Litem's report, the court concluded that termination of respondents' parental rights served the best interests of the children by facilitating their adoption. Respondent-mother filed timely notice of appeal from the termination order.
In her first argument on appeal, respondent-mother challenges six of the court's findings of fact and its conclusions of law that grounds for termination existed under N.C. Gen. Stat. § 7B-1111(a)(1) and (9). She contends that evidence did not show a likelihood that she would neglect the children in the future, as required to support termination under N.C. Gen. Stat. § 7B-1111(a)(1), or that she was currently unable or unwilling to establish a safe home for the children, as required to support termination under N.C. Gen. Stat. § 7B-1111(a)(9). A proceeding for termination of parental rights is conducted in two stages. At the adjudicatory stage, the petitioner has the burden of proving grounds for termination under N.C. Gen. Stat. § 7B-1111(a) by "clear, cogent, and convincing evidence." N.C. Gen. Stat. § 7B-1109(f) (2005). "Once one or more of the grounds for termination are established, the trial court must proceed to the dispositional stage where the best interests of the child are considered." In re Locklear, 151 N.C. App. 573, 575, 566 S.E.2d 165, 166 (2002).
In reviewing the adjudication of grounds for termination under N.C. Gen. Stat. § 7B-1111(a), we must determine whether the district court's findings of fact are supported by the evidence and whether the court's findings, in turn, support its conclusions of law. In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000). Because the district court sits as trier of fact, its "findings of fact are conclusive on appeal if they are supported by 'ample, competent evidence,' even if there is evidence to the contrary." In re J.M.W., __ N.C. App. __, __, 635 S.E.2d 916, 919 (2006) (quoting In re Williamson, 91 N.C. App. 668, 674, 373 S.E.2d 317, 320 (1988)). Moreover, any findings which are not assigned as error are deemed "to be supported by competent evidence and [are] binding on appeal." Koufman v. Koufman, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). We review the court's conclusions of law de novo. In re D.H., C.H., B.M, C.H. III, 177 N.C. App. 700, 703, 629 S.E.2d 920, 922 (2006) (citation omitted). Before addressing the findings challenged by respondent-mother, we note the following uncontested findings entered by the court in support of its adjudications under N.C. Gen. Stat. § 7B-1111(a)(1), (9):
9. That at the time of the filing of the petition alleging neglect in this matter, [WCHS] had been looking for the children for several weeks due to the concerns of the medical professionals at Duke Hospital for the physical safety of the twins. The twins were born prematurely and with a low birth weight and had not been brought back to the Pediatric Unit for necessary follow up care.
10. That the mother and father were living from pillar to post and had no stable home at the time of the filing of the petition. When the children were living at the home of the mother's daughter, [respondent-mother] disappeared for several days . . . .
11. The parents had been moving from house to house in Granville and Wake County. [Respondent-]mother was finally located when she was arrested for shoplifting and placed in Wake County Jail. She was released on March 10, 2006.
12. That the mother has had a long history of abuse of cocaine, heroin and marijuana use.
***
15. That the mother's parental rights in regard to [three children] were terminated by this Court in 03 J 477. The children were placed in foster care on March 11, 2002 due to the mother's chronic problem with cocaine use that resulted in the birth of cocaine positive children, improper parenting, a history of relationships characterized by domestic violence, and the failure to provide her children with stability and adequate resources. The mother made attempts at rehabilitation but soon relapsed and continued her pattern of substance abuse and instability. Her rights to three older children were terminated by the juvenile court in Vance County, NC under 98 J 128.
***
17. That the Court ordered the parents to have psychological evaluations, maintain contact with WCHS and the minor children, complete substance abuse assessments, maintain stable employment and housing and to register for and pay child support. The mother was also ordered to complete random drug screens.
18. That since the children were removed from her care, the mother was arrested four times and spent considerable time locked up. She was in women's prison from May 31, 2006 until September 26, 2006[.] On December 16, 2006 she was arrested for transportation of copper, driving without a license, and an expired registration and spent a day in jail.
***
21. That the mother has had infrequent contact with the minor children since they were removed from her care. She has visited only 5 times in 11 months, and has just recently, and after the filing of the motion to terminate parental rights, displayed a commitment to see them on a regular basis.
22. That the mother had no contact with the social worker from May 16, 2006 until September 26, 2006, when the mother was released from Women's Prison.
***
24. That the mother . . . has not paid child support as ordered. The mother stated that she recently tried to make her first payment.
We are bound by these findings for purposes of the instant appeal. Koufman, 330 N.C. at 97, 408 S.E.2d at 731.
We further observe that respondent-mother relies upon a single assignment of error to assert that portions of six enumerated findings of fact are unsupported by clear, cogent and convincing evidence. "It is well-established that '[a] single assignment generally challenging the sufficiency of the evidence to support numerous findings of fact . . . is broadside and ineffective.'"State v. Sutton, 167 N.C. App. 242, 244-45, 605 S.E.2d 483, 485 (2004) (quoting Wade v. Wade, 72 N.C. App. 372, 375-76, 325 S.E.2d 260, 266 (1985)) (alteration in original), appeal dismissed and disc. rev. denied, 359 N.C. 326, 611 S.E.2d 847 (2005). Nonetheless, we shall review each of the contested findings.
Respondent-mother first assigns error to the following finding:
19. That the mother offered no evidence that she has obtained or maintained a stable home environment since the children were removed from her care on February 20, 2006.
However, she does not contest the additional facts found by the court which support this finding:
10. That the mother and father were living from pillar to post and had no stable home at the time of the filing of the petition.
***
11. The parents had been moving from house to house in Granville and Wake County. [Respondent-]mother was finally located when she was arrested for shoplifting and placed in Wake County Jail.
***
18. That since the children were removed from her care, the mother was arrested four times and spent considerable time locked up.
***
19. [Respondent-mother] provided some phone numbers to the social worker, but when the worker tried to contact the mother, she was not a[t] these locations. Since leaving Women's Prison in late September the mother indicated that she has lived at her mother's home in Stem, NC, that she has worked for Waffle House[,] and in late December, she enlisted the services of United Youth Care Services for substance abuse counseling and parenting education. She has not requested that her mother's home be assessed by WCHS. She stated that there was a plan to allocate some of her mother's property to her for a residence. Mr. Abdul-Haqq, case manager for this agency, testified that the mother since December 27, 2006 . . . is looking for stable housing.
***
22. That the mother had no contact with the social worker from May 16, 2006 until September 26, 2006, when the mother was released from Women's Prison.
These facts fully support a finding that respondent-mother had not shown that she had obtained stable housing after more than eleven months of WCHS involvement in her case. Moreover, this finding was fully supported by the evidence at the hearing. WCHS social worker LeAnn Watson testified that from February until late September, 2006, respondent-mother was either incarcerated or living with "various people" at "[v]arious addresses." For "long periods" during this time, Watson was unable to locate or contact respondent-mother. Calls to the "various phone numbers" provided by respondent-mother were unavailing. Moreover, although respondent-mother reported moving in with her mother after being released from jail in late September, 2006, she offered no evidence of the conditions of her mother's house or its suitability for the children. She testified that her own mother was "crippled over" and required care, and that she also shared the house with respondent-mother's brother, who was blind and in need of assistance. Respondent-mother had never obtained independent housing and testified that she was "trying to save money to get into my own house" near her mother. Her own witness, Abdul-Haqq, told the court that she was "trying to get a trailer or something like that" to place on her mother's property. At the time of the hearing, respondent-mother had additional criminal charges pending for acts she committed in December, 2006.
Respondent-mother also challenges the finding that she " has not completed a psychological evaluation as ordered by the Court though an appointment was made for this by the social worker." We find no merit to her claim. Watson testified that respondent-mother was ordered as part of her case plan "to have a sociological evaluation [and] follow-up with any recommendations of treatment," but failed to do so. Watson testified that she scheduled two appointments for respondent-mother's evaluation in the spring and summer but was unable to get in contact with her. Asked if respondent-mother had a mental impairment that would preclude her from parenting the children, Watson reiterated that respondent-mother had not had the sociological evaluation that might answer that question. Although Abdul-Haqq testified that his organization had conducted a brief assessment of respondent-mother and was scheduling a "full sociological evaluation" for her, the record plainly shows her failure to complete the court-ordered evaluation prescribed by her case plan.
Respondent-mother next objects to the following finding as unsupported by the evidence at the hearing:
23. That the mother, whose rights have been terminated in regard to 6 of her children, has not demonstrated that she has the ability or willingness to establish a safe home.
While acknowledging her "past behavior," she accuses the court of ignoring her uncontradicted "evidence that she had a plan to provide her children a safe home" at the time of the termination hearing.
We again find no merit to this claim. The court heard evidence of respondent-mother's long history of drug abuse and instability. Having lost her parental rights to six prior children, respondent-mother failed to obtain necessary medical care for her prematurely-born twins and essentially disappeared. After her arrest for shoplifting in March, 2006, respondent-mother failed to maintain contact with WCHS, to provide WCHS with a fixed address or other means to contact her, or otherwise to comply with her case plan. Respondent-mother was arrested and incarcerated on multiple occasions since losing custody of her children in February, 2006. Moreover, having been ordered by the court to attend at least bi-weekly visitations, she visited the children on just two occasions between February and October, 2006. What limited progress respondent-mother claimed as of 22 January 2007 by no means demonstrated her ability to provide a safe, stable home for two infant children. While WCHS bore the affirmative burden to proveher inability or unwillingness to provide a safe home under N.C. Gen. Stat. § 7B-1111(a)(9), we believe the evidence supported the court's finding of the paucity of respondent-mother's own proffer on this issue. See N.C. Gen. Stat. § 7B-1109(f) (2005).
We also overrule respondent-mother's assignment of error to the finding that she "provided no evidence of maintaining a sufficient income to support the children." Respondent-mother testified that she had been working at Waffle House in Butner since 6 October 2006. However, she did not tender documentation of her income to WCHS or the court. Moreover, she had yet to pay any child support for the children as ordered by the court on 1 May 2006. She was living with her mother and was unable to afford moving into her own home.
Respondent-mother also challenges the finding that she "offered no sufficient evidence that she has been clean of illegal substances." Watson testified that respondent-mother admitted to using marijuana while pregnant with Le.H. and La.H. After entering into her case plan with WCHS, she submitted two negative drug screens on 21 March 2006 and 3 April 2006, but then refused to submit screens on 19 April 2006 and 16 May 2006. WCHS views such refusals as positive screens. Although respondent-mother testified that she missed only one drug screen and had "been clean now for two years[,]" the court was entitled to credit Watson's testimony to the contrary. See In re Gleisner, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). After having no contact with WCHS from 17 May 2006 until 26 September 2006, respondent-mother contacted WCHS in October, 2006 and sought to resume visitations. She submitted three negative drug screens thereafter. Abdul-Haqq testified that respondent-mother began attending semi-weekly AA and NA meetings at some point after 27 December 2006. Given respondent-mother's documented history of chronic substance abuse, her two refusals to submit screens followed by several months without testing were sufficient grounds for the court's finding, despite her subsequent brief interval of sobriety.
The sixth and final adjudicatory finding to which respondent-mother assigns error is the following:
32. That the mother contributed [to] the neglect of the children . . . . In light of her history of substance abuse, instability, inconsistent parenting and her failure to comply with the orders of this court and display a commitment to provide a safe home for her children from . . . February, 2006, up until the time this motion to terminate parental rights was filed in October, 2006, it is likely that the neglect would continue if the children were placed in her care.
In her brief to this Court, respondent-mother acknowledges her prior neglect of the minor children, as well as her unstable behavior from February to October of 2006. She argues, however, that WCHS adduced no evidence of instability or substance abuse at the time of the termination hearing, or of a likelihood of future neglect if the children were returned to her. Rather, she contends, "[a]ll evidence of her present actions contradicted [the court's] finding."
Though cast by the court as a finding of fact, a determination of neglect or the likelihood of future neglect "requires the application of . . . legal principles . . . and is therefore a conclusion of law." In re Helms, 127 N.C. App. 505, 510, 491 S.E.2d 672, 676 (1997). Here, the court entered this "finding" in support of its more generic legal conclusion  also assigned as error by respondent-mother  "[t]hat there are sufficient facts to warrant a determination by clear, cogent and convincing evidence that grounds exist for termination of the parental rights of . . . the mother and father of the minor children pursuant to N.C.[Gen. Stat. §] 7B[-]1111(a)(1)." Accordingly, we treat the purported finding as a conclusion of law. Id. As noted above, "review of a trial court's conclusions of law is limited to whether they are supported by the findings of fact." Id. at 511, 491 S.E.2d at 676 (citing In re Montgomery, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)).
A court may terminate a respondent's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1) upon a finding that the parent has neglected the child within the meaning of N.C. Gen. Stat. § 7B-101(15) (2005). Subsection 7B-101(15) defines a neglected juvenile, inter alia, as follows:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent . . .; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare . . . .
N.C. Gen. Stat. § 7B-101(15) (2005). Moreover, to constitute actionable neglect under N.C. Gen. Stat. § 7B-1111(a)(1), "there [must] be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (citations and quotations omitted). "In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7B-101(15) (2005).
To establish grounds for termination under N.C. Gen. Stat. § 7B-1111(a)(1), the evidence must show neglect by the parent "at the time of the termination proceeding." In re Young, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997) (citation omitted). Where the child has been removed from the parent's home prior to the hearing, "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (citation omitted). It is well established that "parental rights may . . . be terminated if there is a showing of a past adjudication of neglect and the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to [his or] her parents." In re Reyes, 136 N.C. App. 812, 815, 526 S.E.2d 499, 501 (2000) (citation omitted). Such an adjudication "must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." In re McLean, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999). As found by the court, respondent-mother failed to obtain necessary medical care for her infant twins, La.H. and Le.H., disappeared from the home, and could not be located for several weeks until she was arrested for shoplifting. After the twins were adjudicated neglected and dependent, respondent-mother failed to comply with her case plan and had no contact with WCHS for months at a time. She twice refused to submit to drug screens, missed two appointments for her psychological evaluation, paid no child support, and attended just two visitations in seven months. Respondent-mother was arrested and jailed on three occasions before WCHS moved for termination of her parental rights on 31 October 2006. The court's findings recognize the positive steps taken by respondent-mother following her release from jail on 26 September 2006. She moved into her mother's house and obtained employment. She submitted clean drug screens and had three additional visitations with the children. On 27 December 2006, she contacted a private organization to obtain social services and reported attending AA and NA meetings. However, at the time of the termination hearing, she had yet to pay child support, establish her own residence, or obtain a full sociological evaluation. She faced additional criminal charges following her arrest in December, 2006.
We believe that the court's findings support its conclusion that respondent-mother's actions were consistent with a longstanding pattern of behavior that created a likelihood of future neglect if La.H and Le.H were returned to her care. See Inre E.N.S., 164 N.C. App. 146, 151, 595 S.E.2d 167, 170 (2004) (affirming trial court's prediction of future neglect based on the mother's actions before the children were born). The court took notice of its own 17 November 2003 order in 03 J 477, terminating respondent-mother's parental rights to L.A.H., L.M.B., and L.D.B. The 2003 order described respondent-mother's history of unstable housing, financial instability, and "a chronic substance abuse problem that has resulted in the birth of cocaine positive children, has resulted in her inability to properly parent her children and has resulted in her inability to provide her children with stability and adequate resources . . . ." Moreover, the order reflected respondent-mother's initial period of compliance with her case plan after WCHS took custody of the children in March, 2002. She attended regular visitations and submitted to in-patient substance abuse treatment followed by attendance at AA and NA meetings. After two of the three children were placed back into her home, however, respondent-mother ceased cooperation with WCHS and resumed her unstable behavior and apparent substance abuse. We note that Watson served as the social worker in 03 J 477, and testified that respondent-mother had displayed the "same problems" in the earlier case.
Because the district court properly found grounds for termination based on neglect under N.C. Gen. Stat. § 7B-1111(a)(1), we need not address the second ground found by the court under N.C. Gen. Stat. § 7B-1111(a)(9). In re Howell, 161 N.C. App. 650, 656, 589 S.E.2d 157, 160-61 (2003) (citing In re Taylor, 97 N.C. App. 57, 64, 387 S.E.2d 230, 233-34 (1990)).
In her second argument on appeal, respondent-mother claims that the district court erred at the dispositional stage of the proceedings by choosing to terminate her parental rights. At disposition, the court is required to "determine whether terminating the parent's rights is in the juvenile's best interest" in view of the following:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen. Stat. § 7B-1110(a) (2005). Once the court has adjudicated grounds for termination under N.C. Gen. Stat. §§ 7B-1109, -1111(a), "[t]he decision to terminate parental rights is vested within the sound discretion of the trial judge and will not be overturned on appeal absent a showing that the judge['s] actions were manifestly unsupported by reason." In re J.A.A. & S.A.A., 175 N.C. App. 66, 75, 623 S.E.2d 45, 51 (2005) (citation omitted).
Respondent-mother assigns error to several of the court's dispositional findings in a single assignment of error. Although she quotes the findings in her brief, she makes no attempt to reckon with the evidence and presents no argument against any particular finding. Accordingly, she has abandoned this assignment of error. See N.C.R. App. P. 28(b)(6) (2007).
Respondent-mother challenges the court's conclusion that termination of her parental rights was in the best interests of La.H. and Le.H. In reaching this conclusion, the court made findings consistent with the Guardian ad Litem's report and Watson's testimony that the children were fifteen months old, and had "developed a strong bond" with the foster parents with whom they had lived since February, 2006. The court found that the children were "doing well physically" and developmentally in their placement, and that the foster parents had shown a commitment to adopting the children. Moreover, the foster parents had "shown a willingness to maintain contact between the minor children and [their] relatives," including respondent-mother, and had "made attempts to establish contacts between the children and their siblings" in other placements. The court further found "[t]hat the children do not have a strong bond with their mother or father" and were highly adoptable. It noted that termination of the parents' rights was necessary to effectuate the permanent placement plan. Based on these findings, as well as the recommendations of Watson and the Guardian ad Litem, the court properly concluded that the twins' best interests would be served by termination of both respondents' parental rights. Respondent-mother separately contends that the court abused its discretion in terminating her parental rights under N.C. Gen. Stat. § 7B-1110. Having upheld the court's evaluation of the children's best interests, and reviewed respondent-mother's long history of substance abuse, instability, and child neglect, we find no abuse of discretion by the court.
Affirmed.
Judges MCGEE and TYSON concur.
Report per Rule 30(e).